**[Cite as *State v. Nelson*, 2015-Ohio-113.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE   COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2014-CA-7 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 13-CR-320 |
| v. | : | |
| | : | |
| FREDERICK NELSON, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

<u>AMENDED   O P I N I O N</u>

Rendered on the 15th day of January, 2015.

. . . . . . . . . . .

STEPHEN K. HALLER, Atty. Reg. #0009172, by ELIZABETH A. ELLIS, Atty. Reg. #0074332, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
        Attorneys for Plaintiff-Appellee

RICHARD B. REILING, Atty. Reg. #0066118, 6135 Memorial Drive, Suite 102-A, Dublin, Ohio 43017
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}    Defendant-appellant Frederick Nelson appeals from his convictions and sentences for Rape, Burglary, and Gross Sexual Imposition.   Nelson contends that the judgment of the trial court is not supported by sufficient evidence, and is against the manifest weight of the evidence.   We conclude that Nelson's convictions for Rape and for Burglary are supported by sufficient evidence, and are not against the manifest weight of the evidence.   His actions permitted a reasonable jury to find that he purposely compelled his victim to submit by force or the threat of force.

{¶ 2}    But we agree with Nelson that his conviction for Gross Sexual Imposition is not supported by sufficient evidence.   There is no evidence in the record that the victim's ability to resist or consent was substantially impaired because of a mental or physical condition, or that Nelson had reasonable cause to believe that her ability was so impaired.

{¶ 3}    Nelson's Gross Sexual Imposition conviction is Reversed; the judgment of the trial court is Affirmed in all other respects; and this cause is Remanded for revision of the sentencing entry accordingly.


## I.   Nelson Pushes His Way into P. R.'s Apartment,
## and Engages in Sexual Acts with Her

{¶ 4}    P.R., a 57-year-old woman, was sitting in the kitchen in her apartment, drinking tea and coffee and smoking cigarettes, in the early morning hours on March 3, 2013.   Her adult daughter, A.W., was asleep on a couch in the living room, which was on the other side of a bedroom from the kitchen.   She heard a knock on the door, and asked who it was.   The response was: "Is Junior here," referring to an acquaintance who went by that nickname.

{¶ 5}     P.R. said that Junior was not there, that he didn't stay there, and "opened the door a little bit and he forced his way in on me." P.R. opened the door to see who it was, "[a]nd he forced his way in the screen door, onto me and pushed me back." The door opened into the kitchen. P.R. did not invite him inside. P.R. told the man, later shown by DNA evidence to be Nelson, she was going to call the police, to which he responded:

A.   "Go ahead, call them. I don't care," real hateful. It scared me.

Q.   That scared you?

A.   Yeah, it scared me when he said it that way, because the way he pushed me into the door – in my door, my own door.

Q.   When did you tell him you were going to call the Police right when he came in or later?

A.   After he pushed me into the door.

{¶ 6}     Nelson had been inside the apartment only once before, with "Junior." He sat down in the kitchen, in a chair between where P.R. went to sit and the door. He was carrying a beer and a "Daisy" cup, from which he drank while he was in the apartment.

{¶ 7}     Nelson started to talk. After a bit:

A.   He sat there and he took out his thing and he told me to look at it and I just glanced over, like what are you doing, you know, to myself and I turned my head. And he was telling me that he wanted me to touch it and didn't want to touch it, and I guess I said, "No" and then I went like this and touched it. (indicating)

Q.   When you say his thing what do you mean?

A.   His penis.

Q.   Okay. And you say he pulled it out. What do you mean he pulled it out?

A. He pulled it out of his pants.

Q. Did he keep his pants on?

A. Yes.

Q. And you're telling the Jury that he wanted you to touch it?

A. Yeah.

Q. All right.   Did you want to touch it?

A. No.

Q. Did you tell him?

A. No, I was too scared.

Q. Why were you scared?

A. I was just scared of the whole idea, you know, him asking that.

* * *

Q. How long do you think you touched it?

A. Very little.

Q. Were you touching it, rubbing it?   What were you doing?

A.   Just went like this, like that, and then took my hand off real quick. (indicating)

Q. What happened next?

A. He kept talking to me, saying how nice of a girl I was, and the first time he met me he thought I was really pretty and he wanted me to suck his penis and I said, "No, I don't want to," and –

* * *

A. Yeah. And I said, "I don't want to." He kept on and on, "Come on, come on. I want you to," you know. He said – I don't know exactly how it was, but it was like, "You're really nice looking. I think you're a good girl. I would like for you to."

And I got scared. I just put my mouth on it and sucked a little bit, and he goes, "You're not sucking it hard enough. Suck on it harder." And I didn't want to, so I didn't, and he had me take it out. I took it out of my mouth.

{¶ 8} By this time, Nelson was standing by the kitchen counter, and P.R. "went down on him." Asked why she complied, P.R. said: "Because I was scared. I was scared of what he might do next, you know, or something, you know, and I was just really scared of him."

{¶ 9} After this, Nelson resumed sitting in the kitchen and poured some of his beer into his "Daisy" cup. He then took P.R.'s cigarette lighter, a gift from her late brother, and put it in his pocket. She asked him to give it back, and he said he wouldn't.

{¶ 10} In her fear and excitement, P.R. had wet herself. She went into the bathroom, which opened off of the kitchen, removed her panties, and put them on a register to dry. She was wearing "a long granny gown, nightgown." Nelson was standing by the bathroom door. P.R. testified that then:

A. He comes in there and tells me to lay down, and I didn't want to lay down, but I laid down.

Q. Why did you lay down?

A. Because I was scared.

Q. Scared of what?

A. Him.

Q. Okay. And what happened when you – so did you lay down or did he lay you down?

A. He laid me down.

* * *

Q. All right. And what happened when he laid you down there by the sink?

A. He took his thing out of his pants and raised my gown and stuck it in me.

Q. When you say his thing, I need you to –

A. His dick.

Q. His dick? Okay.

A. His penis or whatever.

Q. All right. And what did he do with his penis?

A. Stuck it in me.

Q. And he stuck it in you where?

A. In my vagina.

Q. Did you want him to do that?

A. No.

Q. And what was he doing when he stuck his penis in your vagina?

A. Going up and down on me.

Q. Going up and down?

A. Mmm-hmm. He had my legs straight up in the air, going up and down on me.

Q. Did you want that to happen?

A.   No.   He kept telling me to move and I didn't move.   He took it out.

**{¶ 11}**   P.R. did not think that Nelson ejaculated.

**{¶ 12}**   After this, P.R. went back to the kitchen and smoked a cigarette.   Nelson stood by the kitchen cabinets, near the door to the outside.   Then:

A.   I started to go in to sit down and he said, "Come here."

And I said, "What do you want?"

And he said, "I want you to try to suck me again."   So I did.   I didn't want to, but I did because I wanted him to leave and I wanted him to get out of there because I had told him once that I would call the Police and I didn't like at all what he did and everything.

So I sat there for a little bit, and he said, "You're not doing it right."   So I stopped and I went and sat down.

He was standing – going out the door and I said, "Give me my lighter back."

And he said, "I'll give it to you tonight at 10:00."   And then right after that I shut my door, locked it, closed my blinds and everything, as far as I could shut them down.   And he knocked on the door.   As far as I know it was him, and I didn't answer the door because I was scared.

**{¶ 13}**   P.R. estimated that it was less than a half hour from the time Nelson entered her apartment until he left.

**{¶ 14}**   P.R. testified that during all three of the sexual acts, Nelson was pulling her by her hair.

{¶ 15}   Nelson had left the "Daisy" cup behind.   P.R. threw it in her waste basket, from which the police subsequently recovered it.

{¶ 16}   In the morning, A.W. noticed that her mother was upset.   When P.R. told her daughter what had happened, her daughter told her to call the police, which P.R. did.   Initially, however, the incident was reported as a burglary, based upon the theft of the lighter.   The responding police officer concluded, after talking with P.R., that a sexual offense might be involved.   Pursuant to protocol, P.R. was transported to the hospital, and a detective came to the scene.

{¶ 17}   No semen was found in P.R.'s vagina, on her person, or in the apartment.   Swabs were taken for DNA analysis from the "Daisy" cup, from P.R.'s vagina, and from Nelson's mouth.   The DNA analysis did not exclude Nelson, and the expert testified that the odds of a DNA sample from a randomly chosen person, other than the perpetrator, matching the results from the DNA sample from the "Daisy" cup were one in 2,156,000,000, or less than one in two billion.

## II.   The Course of Proceedings

{¶ 18}   Nelson was arrested and charged by indictment with one count of Rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree; one count of Burglary, in violation of R.C. 2911.12(A)(2), a felony of the second degree; one count of Gross Sexual Imposition, in violation of R.C. 2907.05(A)(5), a felony of the fourth degree; and one count of Sexual Battery, in violation of R.C. 2907.03(A)(2), a felony of the third degree.   The Rape count was based on the act of vaginal intercourse in the bathroom.   The Gross Sexual Imposition and Sexual Battery

counts were based upon the acts of fellatio in the kitchen.

{¶ 19}   Nelson was tried by a jury.   At the conclusion of the State's case, he moved for a judgment of acquittal, as to all counts, under Crim.R. 29.   In ruling upon this motion, the trial court concluded that P.R. had failed, in the courtroom, to identify Nelson as the perpetrator of the offenses, because the trial court had been unable to determine who she was identifying in the courtroom.   The trial court nevertheless concluded that Nelson's identity as the perpetrator had been satisfactorily proven by P.R.'s testimony that the perpetrator drank out of the "Daisy" cup, and the DNA evidence linking the DNA recovered from that cup to the DNA recovered from Nelson.

{¶ 20}   The trial court concluded that there was insufficient proof that Nelson knew that P.R. was impaired, for purposes of the Sexual Battery count, and sustained Nelson's motion for judgment of acquittal on that count.   The trial court, noting that it was a "close call," concluded that there was sufficient evidence that Nelson had reasonable cause to believe that P.R. was impaired to go to a jury on the Gross Sexual Imposition count.   The trial court overruled the Crim.R. 29 motion as to the Rape, Burglary, and Gross Sexual Imposition counts.

{¶ 21}   Nelson was convicted of Rape, Burglary, and Gross Sexual Imposition.   The trial court sentenced Nelson to a prison term of eight years for Rape, eight years for Burglary, and eighteen months for Gross Sexual Imposition, with all three sentences to be served concurrently, for a total prison term of eight years.   From his conviction and sentence, Nelson appeals, setting forth the following assignments of error:

THE STATE FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO

SUSTAIN A CONVICTION IN VIOLATION OF APPELLANT'S RIGHT TO

DUE PROCESS OF LAW AS GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### III.  Nelson's Rape and Burglary Convictions Are Supported by Sufficient Evidence, and Are Not Against the Manifest Weight of the Evidence

{¶ 22}  In support of his First Assignment of Error, Nelson argues that there was insufficient proof of his identity as the perpetrator.  We agree with the trial court, however, that the DNA evidence obtained from the "Daisy" cup the perpetrator left behind is sufficient to permit a reasonable jury to conclude, beyond a reasonable doubt, that Nelson was the perpetrator.

{¶ 23}  Nelson argues that there is insufficient proof that Nelson compelled P.R. to submit by force or threat of force.  R.C. 2907.02(A)(2).  P.R. acknowledged that Nelson uttered no threats during the incident in the bathroom.  Also, while she testified that she said, "no" to him, she also testified that she said this "in a real soft voice," and that she did not know if Nelson heard her.

{¶ 24}  A threat of force can be inferred from the circumstances surrounding sexual conduct.  *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus. "Force need not be overt and physically brutal, but can be subtle and psychological.  As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established."  *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304

(1988).

**{¶ 25}** In the case before us, P.R. testified that she was afraid of Nelson, and she also testified concerning acts of Nelson that put her in fear. These acts began with Nelson pushing his way into P.R.'s apartment in the early morning hours.[1] When she then told him that she would call the police, he replied, "Go ahead, call them. I don't care," in a hateful tone of voice that frightened her. Before the vaginal intercourse in the bathroom, and after Nelson had insisted on oral sex in the kitchen, pulling P.R. down on him by her hair, he took her lighter, and refused her request to give it back. So scared that she wet herself, P.R. went to the bathroom to remove and dry her underwear. Nelson followed her to the bathroom door, not affording her any privacy. He then insisted that P.R. lie down on the bathroom floor, "laid" her down by the scales, and had vaginal intercourse with her, again pulling her by her hair.

**{¶ 26}** The record does not disclose any purpose that Nelson had for his 30-minute visit other than engaging P.R. in sexual acts. We conclude that the jury could reasonably find that Nelson committed the acts of intimidation noted in the preceding paragraph for the purpose of compelling P.R. to submit. We further conclude that the jury could reasonably find that these acts, while perhaps subtle and psychological, caused P.R. to fear that Nelson would harm her if she did not submit. Therefore, we conclude that Nelson's Rape conviction is supported by sufficient evidence.

**{¶ 27}** In arguing that his Burglary conviction is not supported by sufficient evidence, Nelson argues primarily that the State failed to prove either Rape or Gross Sexual Imposition. We conclude that there was sufficient evidence to prove the Rape. Nelson also argues that he

---

[1] At one point, P.R. testified it was between 2:00 and 3:00 a.m. At another, she testified it was about 4:00 in the morning.

did not have the purpose to commit either offense when he entered P.R.'s apartment. Considering, however, that Nelson's only significant interactions with P.R. during the thirty minutes he was in her apartment were to engage her in vaginal intercourse and in two acts of fellatio, and to steal her lighter, we conclude that a reasonable jury could infer that he had the purpose to commit a sexual offense when he forced his way into P.R.'s apartment and rebuffed her stated intent to call the police.

{¶ 28} Nelson bases his weight-of-the-evidence assignment of error upon the same arguments that he bases his sufficiency-of-the-evidence assignment of error. We reject these arguments for the same reasons.

{¶ 29} When a conviction is challenged as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that a substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson,* 2d Dist.

Montgomery No. 16288, 1997 WL 477684, *5 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). We conclude that this is not the exceptional case where a jury has lost its way, resulting in a manifest miscarriage of justice.

### IV.  Nelson's Gross Sexual Imposition Conviction

### Is Not Supported by Sufficient Evidence

{¶ 30}  R.C. 2907.05(A)(5), proscribing the offense of which Nelson was convicted, is as follows:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; * * * when any of the following applies:
>
> * * *
>
> (5) The ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 31}  Nelson contends that there is insufficient proof that P.R.'s ability to resist or consent was substantially impaired because of a mental or physical condition.  P.R.'s treating psychiatrist, Dr. Mahmood Rahman, testified.  No report had been produced to Nelson in

discovery. Dr. Rahman therefore testified as a fact witness. He did not offer any opinions as an expert. He had diagnosed P.R. with bipolar affective disorder with psychotic features, and with panic disorder. He prescribed four different medications for her conditions, which she testified she was taking at the time of the alleged offenses.

{¶ 32} No one, not Dr. Rahman, and not anyone else, testified that P.R.'s ability to resist or consent was substantially impaired because of her mental condition. The State argues that "the jury could reasonably conclude based upon P.R.'s medical history of having a mental condition, the fact that she receives social security disability for that condition, and her appearance and demeanor on the stand demonstrate that her ability to resist is substantially impaired as compared to the average person in the general population." The State cites *State v. Dorsey*, 5th Dist. Licking No. 2007-CA-091, 2008-Ohio-2515, for the proposition that substantial impairment may be proven by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct, arguing that the jury in the case before us could base its finding of substantial impairment upon its observation of P.R. on the witness stand, in the absence of any other evidence of substantial impairment.

{¶ 33} We note that in *Dorsey* the victim did not testify, and an expert witness testified that the victim in that case "was not able to consent to sexual relations." *Dorsey*, ¶ 54.

{¶ 34} In *State v. Brady*, 8th Dist. Cuyahoga No. 87854, 2007-Ohio-1453, ¶ 79, a case cited in *Dorsey*, there was evidence that the victim "functioned at a pre-teen level," and "could never drive, cook, manage money or live independently." In the case before us, by contrast, P.R. testified that apart from having her daughter drive her to pay her bills, she paid her own bills, was a high-school graduate, had no case worker, did her own grocery shopping, had been married to

another person, twice, once for "maybe one year," and had told the nurse at the hospital that she had had consensual sex a week before the alleged offenses.

{¶ 35}  In the case before us, there is no evidence in the record to establish that P.R.'s ability to consent or resist was substantially impaired.  The State asks us to defer to the jury's assessment of P.R. on the witness stand, based not on her testimony, but on her demeanor.  A factfinder's observation of the demeanor of a witness may properly inform its judgment as to the witness's credibility, applying the tests for credibility that are familiar to everyone.  But a jury has no expertise that would enable it to use its observation of a witness's present demeanor on the witness stand to decide whether that witness's ability to consent or resist was substantially impaired on a prior occasion.  Under some circumstances a finding of a mental condition may be based upon lay testimony, but it must be based upon some evidence in the record, not upon a jury's assessment of a person's demeanor on the witness stand.

{¶ 36}  We conclude that there is insufficient evidence in this record to permit a reasonable jury to find, beyond reasonable doubt, that P.R.'s ability to resist or consent was substantially impaired by a mental condition, for which she was being treated with appropriate medication.

{¶ 37}  Nelson's First Assignment of Error is sustained with respect to his Gross Sexual Imposition conviction, and is overruled in all other respects.  His Second Assignment of Error is rendered moot with respect to his Gross Sexual Imposition conviction, and is overruled in all other respects.

**V.   Conclusion**

{¶ 38} Nelson's First Assignment of Error having been sustained with respect to his Gross Sexual Imposition conviction, that conviction is Reversed and Vacated. The judgment of the trial court is Affirmed in all other respects. This cause is Remanded for amendment of the sentencing entry in accordance with this opinion.

. . . . . . . . . . . . .

FROELICH, P.J., concurs.

HALL, J., concurring and dissenting:

{¶ 39} I agree with the lead opinion and its analysis except with regard to the sufficiency of the evidence to support the conviction for gross sexual imposition (GSI). The question in that regard is whether there was sufficient evidence under R.C. 2907.05(A)(5) to allow the jury to conclude that "[t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition * * *."

{¶ 40} There is no doubt that the victim has "bipolar disorder" (T. 43, l. 23) for which she takes multiple medications. (T. 44, l. 13). A fair reading of the victim's description of the incidents of the early morning hours of March 3, 2013 results in the conclusion that her account is odd and unusual. She seemed more concerned that the offender had taken her cigarette lighter than that he had sexually assaulted her. Defense counsel referred to her behavior that night as "bizarre" and "weird."(T. 234, l. 4). She testified that after the offender left, which was somewhere around 4:00 a.m., she just sat rocking in her kitchen chair. (T. 72, l. 17-24). When her daughter, who was in another room in the household, awoke around 7:00 or 8:00 a.m., the victim indicated it was evident to the daughter something was wrong because she was in her chair "rocking real hard." (T. 73, l. 2-7).

{¶ 41}   The jurors not only heard the evidence as it appears in the transcript. They also observed the victim's demeanor as did the other trial participants. The trial court noted that whether there was sufficient evidence for the GSI offense was a "close call" (T. 220) but found that the evidence was sufficient. The prosecutor's closing argument included the following:

> And let's talk about [the victim]. It is quite obvious by looking at her, she has some issues. And we brought the doctor in today to show you that she has some issues. She's bipolar, she has panic attacks, she has anxiety, she has mental conditions. But you don't need the doctor to know that.
>
> By observing her yesterday it was quite obvious that she has some issues, and he took advantage of that. He took advantage of an older woman. He took advantage of a mentally infirmed (sic) woman * * *."

(T. 229, l. 10-19).

{¶ 42}   And in rebuttal, the prosecutor stated: "Think back to her demeanor and her mental state. She is a child; child like." (T. 238, l. 18-19).

{¶ 43}   When evaluating sufficiency, the evidence must be construed in the light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991) paragraph two of the syllabus. I would find that the testimonial evidence, coupled with the jury's observation of the victim, was sufficient to allow the jury reasonably to conclude that the victim's ability to resist or consent was substantially impaired because of a mental condition.

{¶ 44}   Nonetheless, the foregoing conclusion does not end the inquiry. Appellant also assigns as error that the verdict on the GSI offense is against the manifest weight of the evidence. Our standard in that regard requires that we engage in a limited weighing of the evidence, which is not construed in favor of the State. *See, e.g., State v. Sullivan*, 10th Dist. Franklin No.

07AP-247, 2008-Ohio-391, ¶ 18. I defer to the jury's assessment of credibility and what evidence to believe. But I am unable to assign much weight to the victim's demeanor and appearance on the witness stand, having not personally observed it, or to have it described more fully in the record. I agree with the trial court that this is a close question. It is so close that, although I believe the evidence is sufficient, I am unable to conclude that the verdict on the GSI offense is supported by the weight of the evidence. I would reverse and remand on that issue.

. . . . . . . . . . . . .

Copies mailed to:

Stephen K. Haller
Elizabeth A. Ellis
Richard B. Reiling
Hon. Stephen Wolaver