[Cite as *State v. Strange*, 2019-Ohio-4188.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28200 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-2098/1 |
| | : | |
| STEVEN P.W. STRANGE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of October, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, P.O. Box 291771, 101 Southmoor Circle NW, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Steven Strange appeals from an October 31, 2018 judgment entry of conviction; he was found guilty of one count of intimidation of a victim, in violation of R.C. 2921.04(B)(1), a felony of the third degree, following a jury trial. We affirm the judgment of the trial court.

{¶ 2} Steven was initially charged on June 3, 2018, by way of complaint in the Montgomery County Municipal Court, Western Division, with one count of trespass in a habitation (person present or likely to be present), in violation of R.C. 2911.12(B), a felony of the fourth degree. A warrant for his arrest was issued the same day. The matter was subsequently transferred to the court of common pleas, and Steven was indicted on July 5, 2018, on one count of intimidation of a victim (Count I) and one count of trespass in a habitation (Count II). Count I included Heather Strange, the defendant's sister, as a co-defendant and provided that the offenses occurred between June 4 and July 3, 2018.[1] On July 10, 2018, the court entered a plea of not guilty on Steven's behalf.

{¶ 3} On October 10, 2018, Steven filed a motion in limine requesting that the trial court exclude evidence of certain text messages to his phone from "Kelly" (Kelly Strange, Steven's mother), as well as communications by his parents to the complaining witness. The following day, Steven filed an amended motion in limine, requesting that the court exclude text messages from Heather Strange and Bryanna Owens to the complaining witness. The court did not rule on the motions in limine on the record.

{¶ 4} Trial was held in October 2018.

{¶ 5} David Mullins testified that on June 2, 2018, he resided in New Lebanon with his girlfriend, Jessica Payne, and Payne's five-year-old daughter. He stated that, at the

---

[1]The charge against Heather was dismissed on May 22, 2019.

time, their home did not have electricity, and they were using a generator that was low on gas. David testified that Jessica called Heather Strange to borrow money to purchase gas, and that Heather brought $80 to their home.

{¶ 6} David testified that, after going to bed that evening, he was awakened at 3:00 a.m. to a loud banging on their front door. He testified that he went downstairs with Jessica behind him, opened the door, and observed Steven "standing there screaming." Steven stated that "his [Steven's] dad was sleeping with my girlfriend and he wanted his sister's money and then he like banged into me into the door and pushed into the house." According to David, Jessica told Steven to get out or she was going to call the police. David also told Steven to get out, but Steven kept screaming. David testified that Steven then "put a cigarette in his mouth and went to light it and when he did I like hit him and shoved him out the door" and locked it. David observed two other men with Steven who did not enter his home.

{¶ 7} David testified that the police arrived minutes after Steven left, and they took his statement. He stated that he told Heather when she dropped off the money that he would pay her back on Sunday when he got paid. David identified a photo of the front door of his home, which he stated showed "Steven's shoeprint where he had been kicking my door." David testified that the police officers retrieved the cigarette, photographed his door, and copied text messages sent from Steven's mother to Jessica's phone.

{¶ 8} The following exchange occurred:

[PROSECUTOR] Q. * * * And later on, were you contacted by any members of Steven's family?

A. Yes.

Q. And around when was that that you, personally, were contacted by them?

A. Just like a couple days after.

Q. What happened?

A. At first, Heather had just been sending - - Steven's sister had been sending text messages saying - -

[DEFENSE COUNSEL]: Objection - -

THE WITNESS: - - if Steven goes to jail - -

* * *

THE COURT: Wait, one second. Counsel approach.

(At sidebar)

[PROSECUTOR]: I'm just trying to elicit the events - -

* * *

THE COURT: I guess part of my concern here is is there a connection. Was he talking to her because if, in fact, there's a chain of, you know, call her, do something and then she talks to someone that's part of the operative facts, so. It's beyond the hearsay exception. But there needs to be a connection and is that going to come out at some point through the phone calls - -

[PROSECUTOR]: Yes. So Steven contacts Heather to try to get her to take care of it as well.

THE COURT: And then - - and that was before these phone calls or texts - -

[PROSECUTOR]:   Yes.

* * *

THE COURT: * * * I understand that but, again, threats can be direct or indirect.   So I guess if there's a good-faith belief that the phone calls from the defendant to his sister are before these texts, then you can get into it.

* * *

THE COURT:   And I won't know until you get that guy on.

* * *

THE COURT:   You check it out and make sure the dates are - -

[DEFENSE COUNSEL]:   Okay.

THE COURT: * * * Objection overruled.

(End sidebar)

David further testified that, toward the end of June, he and Jessica ran into Heather and her boyfriend, Eric, at the Dollar General in Drexel, and that Heather approached Jessica and repeatedly asked her for $80.   He stated that after they got into their car, Eric came around to the driver's side and started beating on David's window.

{¶ 9} The following exchange occurred:

BY [PROSECUTOR]:

Q. And are you aware of anything else around that time, as well, that happened to you specifically?

A.   Steven's dad had come in front of my dad's house.

Q.   And around when was that?   Was that in June as well or when was that?

A.   Towards the end.

Q.   Of June?

A.   Yes.

Q. * * *.   Of 2018?

A.   Yes.   He had - - Steven's dad pulled up in a black truck on the right side of my dad's house.   There's a stop sign and then there's the brick wall of the highway in front so you have to go left or right.   Well, he was in a black truck with a trailer dragging behind and he had turned the corner, took a left and stopped in front of my dad's and rolled the window down and told Jessica - -

[DEFENSE COUNSEL]:   Objection, Your Honor.

THE COURT:   Overruled.

THE WITNESS:   He said * * * you're going to get yours, b****.   And then he hold (sic) the brake and hit the gas until it got real smoky and then let off the brake and took off.

{¶ 10}  David testified that after the incidents, he thought that if he and Jessica went "to court on Steven that they're going to try to hurt us."   He testified that, as a result, Jessica began carrying pepper spray and he began carrying a knife, "[b]ecause if they all come up on me, I'm not going to let them kill me."

{¶ 11} On cross-examination, David stated that he did not observe Steven kicking the front door of his home.   He stated that the men behind Steven "were just kinda like standing there back of him and the other guy was trying to get him to come on."   David testified that after the incident at his father's house, he "flagged an officer down" in New

Lebanon and "told him that they had approached me."

{¶ 12} Jessica Payne testified that she had known Heather Strange for two and a half years and was friends with her, Steven, and their sister, Ashley. She testified consistently with David regarding Steven's entering their home. Jessica testified that she called the police after Steven left and gave them a statement.

{¶ 13} The following exchange occurred after Jessica was asked if she had been approached by a member of the Strange family after the incident:

A. The first time was within a couple days after the incident on June 2nd which was by his mother. She came to my job [at Casey's gas station in New Lebanon.]

[PROSECUTOR] Q. Can you recall, at all, like a date?

A. No, I know it was before June 7th. It was in five days between June 2nd and June 7th.

Q. * * * What happened in that incident?

A. She had came in and - -

Q. She who?

A. Kelly did, Steven's mom.

* * *

A. Came in and told me that it was complete bullcrap that we were - -

[DEFENSE COUNSEL]: Objection, Your Honor.

THE WITNESS: - - that we called the police against Steven.

THE COURT: Overruled.

THE WITNESS:  And told me that she was going to make me lose my job.  I asked her how so.  And she said that I had gave her free food before.  I told her to get out of my job and I was going to make her trespass off - - I called the officer.  He came and took a statement.

* * *

Q. * * * And how about the second incident?  When did this happen?

A.  The second incident was in the same - - within the same two weeks.  I don't know the exact date.  And Heather and Eric, which is Steven's sister and her boyfriend, came up to me and Dave - -

[DEFENSE COUNSEL]:  Objection.

THE WITNESS:  - - and my five-year-old daughter at the Dollar General in Trotwood.

BY [PROSECUTOR]:  And what happened there?

A.  She met me by the door entrance of the Dollar General and was telling me to give her $80 right then and to not go to court against Steven. We told her to get away because I had my daughter with us.  I hurried up and got in the vehicle, shut all the doors.  And that's when Heather's boyfriend, Eric, came around and started pounding on my windshield and the side doors.

Q.  And how did you feel when this was happening.

A.  Scared.  My daughter was with me.

Q.  Before that, did you have any issues with Eric?

A.  * * * No, I have not.

* * *

Q.   And how about the next incident, what happened?

A.   I was standing at my boyfriend Dave's father's house in Trotwood and Steven's father, Big Steve, came up in his truck around the house - - and we were standing out front - - and he stopped and he looked at me and pointed and he said you'll get yours b**** and he rolled up and he revved up his engine and started off down the street.   I made another incident on that.

{¶ 14} Jessica stated that she felt threatened and that Steven's family had threatened her and her entire family.   She stated that Steven's girlfriend, "Bree," had texted her several times after that incident, begging her "to not go further, more court dates and stuff against Steven."

{¶ 15} Officer Clinton Goad testified that he was employed by the New Lebanon Police Department, and that he responded to Casey's on June 6, 2018, where he came into contact with Jessica. The following exchange occurred:

[PROSECUTOR] Q.   And so when you were speaking with Jessica, who did you come to understand had came into the General Store?

A.   She advised that Kelly Strange had come to the General Store.

* * *

Q.   And what was the nature of the contact between them?

A.   Jessica advised that Kelly had come to the store - -

[DEFENSE COUNSEL]:   Objection, Your Honor.

THE COURT:   Counsel approach.

(At sidebar)

THE COURT:   * * * I'm trying to figure out.   This is on because the witness intimidation includes what she said in the report.   I believe -- * * * try to keep him from specifics but I think you can get into what happened and if there was a threat that can come out - -

[DEFENSE COUNSEL]: (Indiscernible)

THE COURT:   Well, and he explained that.   The thing is normally if someone goes and talks to someone you can't - - so-and-so said such-and-such.   But the whole point of this is witness intimidation.   So she reported that.   And I think if you can try as much, unless there were threats in there and I'm not exactly sure what was said, he can go over to what happened in a general - - what was going on - -

* * *

THE COURT: * * * So kind of watch it but I'm going to give a little latitude and that's only because this is witness intimidation which includes threats.

* * *

THE COURT:   So if she's reporting a threat, I think that's okay. * * *

(End Sidebar)

BY [PROSECUTOR]:   And what was the nature of the contact between Kelly Strange and Jessica Payne?

A.   Jessica explained to me that Kelly had been unpleasant after a short time at the store and had harassed her and talked about this case and

threatened to get her fired and Jessica did not want to put up with that so she spoke with her bosses and her boss had given her permission to have Kelly trespassed from the store.

{¶ 16} Officer Steven Gingry of the New Lebanon Police Department testified that on June 2, 2018, he was working as a patrolman when he responded to David and Jessica's home on a report of "shots fired at a house." He stated that he collected a "burnt cigarette" and a pack of L&M cigarettes, and he photographed the front door. Gingry obtained written statements from David and Jessica. He testified that he looked for shell casings in the area of the house and for bullet holes in the home "because they said that they possibly heard gunshot," but he did not find anything. Gingry stated that he returned to the police department and then went to Steven's home, where he found Steven in the driveway. Gingry stated that he placed Steven under arrest. On cross-examination, Gingry stated that David brought the cigarette to him from inside the home. On redirect examination, Gingry testified that the cigarette he collected was analyzed for DNA and that David's and Steven's DNA were on the cigarette.

{¶ 17} Scott Chapman, the administrative sergeant at the Montgomery County Sheriff's Office and the keeper of the records, testified that the jail phone system was recorded by Paytel. Chapman testified that, in order to make a phone call, inmates must enter a pin number consisting of their booking number and the last four digits of their Social Security number, and the Paytel system allows them to access their phone calls by means of the pin numbers. Chapman testified that he retrieved three of Steven's recorded phone calls. He identified a disk he made containing the calls.

{¶ 18} Officer Gingry was recalled, and he testified that he listened to recordings

of Steven's phone calls, which included phone calls from the jail between Steven and his girlfriend, Bryanna Owens; his mom, Kelly Strange; his father, Steven Strange; and his sisters, Ashley and Heather Strange. A two-minute audio recording was played for the jury, and Gingry testified that the phone calls reflected "Steven trying to get his family members to go to Dave and Jessica's house and either harm them or intimidate them to not show up for court or drop the case or not prosecute this case." He stated that the call were made on June 4, June 8, 2018, and June 10, 2018, and these calls were played for the jury. Gingry testified that, based upon the recorded calls, he was concerned that "harm was going to be inflicted on the victims of this reported crime." He testified that he was aware of the incident at Dollar General involving David, Jessica, Heather and Eric, as well as the incident in front of David's father's home. On cross-examination, Gingry testified that he reviewed the calls on June 19, 2018, and contacted Jessica the following day. He stated that he was also aware of the incident at Jessica's place of employment.

{¶ 19} At the conclusion of the State's evidence, the court overruled defense counsel's motion for judgment of acquittal.

{¶ 20} Bryanna Owens, Steven's former girlfriend, and Brandon Schroyer, Steven's friend, testified on Steven's behalf. Their testimony was not relevant to the offense of intimidation of a victim but only to the trespass offense.

{¶ 21} The jury found Steven guilty of intimidation of a victim and not guilty of trespass in a habitation. He was sentenced to 30 months in prison.

{¶ 22} Steven asserts three assignments of error. His first assigned error is as follows:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN

ADMITTING HEARSAY EVIDENCE OVER THE OBJECTION OF DEFENSE COUNSEL.

{¶ 23} As this Court noted in *Abrams v. Abrams*, 2017-Ohio-4319, 92 N.E.3d 368, ¶ 30 (2d Dist.):

> * * * " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "To constitute hearsay, two elements are needed. First, there must be an out-of-court statement. Second, the statement must be offered to prove the truth of the matter asserted. If either element is not present, the statement is not 'hearsay.' " (Footnote and citations omitted) *State v. Maurer*, 15 Ohio St.3d 239, 262, 473 N.E.2d 768 (1984). *Accord State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 75.

{¶ 24} In *State v. Brown*, 2d Dist. Montgomery No. 27571, 2018-Ohio-3294, we observed:

> An out of court statement is not hearsay if it "is offered to prove a statement was made and not for its truth, * * * to show a state of mind, or to explain an act in question." *Maurer* at 262. *Accord State v. Williams*, 38 Ohio St.3d 346, 348, 528 N.E.2d 910 (1988) (finding "[a] statement is not hearsay if it is admitted to prove that the declarant made it, rather than to prove the truth of its contents"). We review rulings regarding hearsay under an abuse-of-discretion standard. (Citation omitted.) *State v. Williams*, 2d Dist. Montgomery No. 26369, 2016-Ohio-322, ¶ 17.

*Id.* at ¶ 21.

**{¶ 25}** This Court further noted in *Brown*:

> * * * "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary. An abuse of discretion includes a situation in which a trial court did not engage in a 'sound reasoning process.' Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

*Id.* at ¶ 17.

**{¶ 26}** Steven directs our attention to David's testimony, as described above, wherein David stated that Heather had been sending text messages, defense counsel objected, and a sidebar occurred. The court overruled the objection, and then David testified that he and Jessica were approached by Heather and Eric at the Dollar General, where Heather demanded money and Eric subsequently beat on the driver's side window of the car with Jessica's daughter inside. David further testified that Steven's father threatened Jessica by saying, "you're going to get yours b****." Steven also directs our attention to Jessica's testimony that his mother, Kelly Strange, told her at Jessica's place of employment that she "was going to make [Jessica] lose [her] job," that Heather told her at the Dollar General "not to go to court against Steven," and that Steven's father told her, "you'll get yours b****." Finally, Steven directs our attention to Officer Goad's testimony that Jessica advised him that Kelly Strange came into her workplace and "harassed her and talked about this case and threatened to get her fired."

{¶ 27} Steven asserts that all of this testimony was improper hearsay evidence, and that Goad's testimony "was hearsay within hearsay." He argues that the error in admitting the testimony was not harmless. Steven asserts that the "only remedy for the prejudicial error is vacating the conviction and granting a new trial."

{¶ 28} The State responds that "in each instance, the statements were not hearsay, or in the alternative satisfied an exception to the hearsay rule, and the trial court did not abuse its discretion by allowing the statements."

{¶ 29} We agree with the State that David's and Jessica's testimony was admitted to prove that the threatening statements and conduct by Heather, Eric, and Steven's father occurred, and that David's and Jessica's testimony accordingly was not hearsay. We further conclude that David's and Jessica's testimony was offered to prove the effect that the threats had upon them, i.e. their state of mind. *See State v. Hanna*, 5th Dist. Knox No. 02CA000041, 2003-Ohio-6402, ¶ 21. In other words, the court did not abuse its discretion in admitting the testimony.

{¶ 30} Regarding Goad's testimony, we note that Crim.R. 52 provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." We conclude that any error in admitting Goad's testimony that Jessica told him that Kelly, Steven's mother, had threatened Jessica's employment was harmless. Jessica herself testified regarding her encounter with Kelly prior to Goad's testimony, and his testimony was consistent with and merely cumulative of Jessica's. In other words, in the absence of Goad's testimony, the outcome of the trial would have been the same.

{¶ 31} For the foregoing reasons, Steven's first assignment of error is overruled.

{¶ 32} Steven's second assignment of error is as follows:

THE STATE DID NOT PRESENT SUFFICIENT EVIDENCE THAT APPELLANT'S THREAT WAS AN "UNLAWFUL THREAT OF HARM" OR "UNLAWFUL THREAT TO COMMIT ANY OFFENSE OR CALUMNY" IN VIOLATION OF R.C. 2901.04 AND THE JURY'S VERDICT CONVICTING APPELLANT OF INTIMIDATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 33} Steven asserts as follows:

The state presented evidence to the jury that consisted of redacted portions of three recorded jail calls made by appellant to members of his family. Appellant did not make any direct threat to either alleged victims [David] or [Jessica] in these recorded jail calls. The statements made by appellant did not connote more than just a threat, i.e. more than just a communication to a person that particular negative consequences will follow should the person not act as the communicator demands. Appellant's statements to members of his family during these recorded jail calls did not violate established criminal or civil law and, therefore, did not constitute an "*unlawful threat of harm*" as set forth in [*State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341].

(Emphasis sic.)

{¶ 34} This Court has previously noted:

When a conviction is challenged as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and

determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of fac[t] to resolve. *State v. DeHaas*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that a substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 477684, *5 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). * * *

*State v. Nelson*, 2d Dist. Greene No. 2014-CA-7, 2015-Ohio-113, ¶ 29.

**{¶ 35}** Regarding the sufficiency of the evidence, this Court has previously stated:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow

the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, "the relevant inquiry is whether any rational finder of fact, after viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A guilty verdict will not be disturbed on appeal unless, "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

*State v. Wilson*, 2d Dist. Montgomery No. 27001, 2016-Ohio-7329, ¶ 6.

**{¶ 36}** R.C. 2921.04 provides, in pertinent part:

(B) No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any of the following persons:

(1) The victim of a crime or delinquent act in the filing or prosecution of criminal charges or a delinquent child action or proceeding;

**{¶ 37}** In *Cress*, to which Steven directs our attention, the Ohio Supreme Court determined as follows:

An *unlawful* threat must * * * connote more than just a threat, i.e., more than just a communication to a person that particular negative

consequences will follow should the person not act as the communicator demands. The word "unlawful" in R.C. 2921.04(B) must add substantive meaning, or it is superfluous. * * *

We hold * * * that the statutory language in R.C. 2921.04(B), proscribing intimidation by an "unlawful threat of harm," is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law. For example, where the making of a threat constitutes the offense of coercion, in violation of R.C. 2905.12, a misdemeanor, that offense would serve as a predicate offense for the crime of witness intimidation as proscribed by R.C. 2921.04(B), a felony.

(Emphasis sic.) *Cress,* 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341, at ¶ 41-42 (footnote omitted).

{¶ 38} We have listened to the recorded phone calls. It is clear that Steven's statements in the calls were related to the underlying trespass charge, and that Steven wanted to hinder his prosecution. In the first call between Steven and his parents, Steven says, "Y'all can't just pull up down there like right now?" He tells his mother, "You and Dad can walk down there and fix that s***. * * * They'll listen." Steven's mom responded, " * * *I tried and you know what he said, I got this taken care of." Steven said "Dad is going to f****** sink me, Dude. You guys pull up down there or I'll be * * *." Steven's mother acknowledges, "We chased them." Steven also says, "Why haven't Dad and Eric pulled up down there?" In the course of the call, Steven says, "If I was out there you'd see what the f*** I'd do. * * * Then you guys can do the same f****** s***." Steven said, "Dad needs to get off his a** and go take care of that." Steven asked his

parents, "You want me to come home and f****** blow your f****** house up?" Steven told his parents, "You probably need to talk to some high hitters * * * and have this resolved," and at the end of the call, he stated, "Anyway, you know what the deal is."

{¶ 39} In the second call, Steven was talking to a female and tells her, "When I come home they're going to regret f***** * * *." He asks, "Are they really going to press the issue?" The female responds, "* * * They're getting cut off in Drexel everywhere, Dude. Everywhere they turn they're going to get f****** turned down, Dude." Steven asks her, "They've been getting turned down?" The female responds, "No, they're going to. * * * ." Steven responds, "You guys can't just pull up and say how about this," and the female responds, "We already did, and they said they're going to call the cops on us." Steve says, "No way, so they're for real."

{¶ 40} In the third call, Steven asks a female speaker what Ashley said, and the partial response was, "What more can I do besides message and blow the b**** up?"

{¶ 41} Viewing the evidence in a light most favorable to the State, we conclude the jury could have reasonably found that Steven's statements to his family were an attempt to intimidate David and Jessica as proscribed by R.C. 2921.04(B)(1). The jury could reasonably infer from Steven's repeated urging to his parents to "fix that sh**," and "go take care of that," and "talk to some high hitters," that Steven wanted his family to unlawfully threaten David and Jessica or their property with harm. Steven asked his parents, "You want me to come home and f****** blow your f****** house up," before telling them, "You know what the deal is."

{¶ 42} Our conclusion is supported by the subsequent actions of Steven's family. Jessica testified that, at the Dollar General, Heather demanded money and told her "not

to go to court against Steven" in a manner that caused Jessica and David to flee to their car with Jessica's young daughter. Heather's boyfriend, Eric, followed them to their vehicle and then beat on the windshield and doors. Jessica testified that Steven's father, from his truck, told her, "you'll get yours, b****." Additionally, Jessica testified that Steven's mother came to her place of work and said "that she was going to make me lose my job."

**{¶ 43}** We note that R.C. 2903.22 proscribes menacing and provides: "(A) No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person * * * or a member of the other person's immediate family. * * *."

**{¶ 44}** David testified that he feared "if * * * we go to court on Steven that they're going to hurt us," and that he began carrying a knife for protection. Jessica testified that Steven's family had threatened her and her entire family, and that she began carrying pepper spray as a result. Officer Gingry testified that, based upon the recorded phone calls, he was concerned that "harm was going to be inflicted on the victims * * *." The jury clearly credited the testimony of the State's witnesses, and we defer to the jury's assessment of credibility.

**{¶ 45}** Having reviewed the entire record, and construing the evidence most strongly in favor of the State, we conclude that Steven's conviction for intimidation of a victim, in violation of R.C. 2921.04(B)(1), was supported by sufficient evidence. Furthermore, it was not against the manifest weight of the evidence. Steven's second assignment of error is overruled.

**{¶ 46}** Steven's third assignment of error is as follows:

THE PROSECUTING ATTORNEY COMMITTED PROSECUTORIAL MISCONDUCT THAT DEPRIVED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

{¶ 47} Steven asserts that the State engaged in prosecutorial misconduct when the assistant prosecuting attorney made the following inflammatory and prejudicial statement in the State's opening statement, which Steven claims was not supported by the evidence: "In one jail call, [Steven] said to his father, 'You need to fix this; I'll get out; I'll blow your house up.' " Steven points out that defense counsel objected to this statement, but the objection was overruled by the trial court.

{¶ 48} The State responds that simply stating Steven's words to his father, which were recorded on a jail phone call and played for the jury later in the trial, did not prejudice Steven. The State also points out that, even if the prosecutor had not referred to the statement, the jury would have heard the jail calls and the statements made by Steven during trial, so he could not have been prejudiced.

{¶ 49} As this court has previously noted:

* * * "Generally, prosecutors are entitled to considerable latitude in opening and closing arguments." *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. *Accord State v. Ballew,* 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). The trial court generally determines the propriety of statements made during opening statement. *State v. Loza*, 71 Ohio St.3d 61, 641 N.E.2d 1082 (1994). Opening statement is not evidence but is intended to advise the jury of what counsel expects the evidence to show. *State v. Turner*, 91 Ohio App.3d 153, 631 N.E.2d 1117 (1st

Dist.1993). As such, the prosecutor and defense counsel may, in good faith, make statements as to what they expect the evidence will show. *Id.*

The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

*State v. Taylor*, 2d Dist. Montgomery No. 23990, 2014-Ohio-3647, ¶ 36-37.

**{¶ 50}** We note that, prior to opening statements, the court instructed the jury that "[o]pening statements are not evidence but they are a preview of the claims of each party designed to help you follow the evidence as it is presented." The entirety of the exchange during the prosecutor's opening statement was as follows:

[THE PROSECUTOR]: * * *

* * *

Now, between the 4th of June and 3rd of July, Mr. Strange was arrested and while he was in jail he tried to fix the situation as I explained to you taking it one step a little too far. We have several jail calls where he's talking to his father, his sister, and his mother. He's imploring them - - fix this, go do something, go talk to them - - meaning [Jessica], [David] - -

go talk to them. In one jail call, he said to his father, "You need to go fix this; I'll get out; I'll blow your house up."

Now, with him just saying go do this, go take care of it, we have even more than that. They did try to fix this. You'll hear evidence that they popped up at [Jessica's] job, meaning the mother - -

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled. You may proceed.

[THE PROSECUTOR]: - - showed up at [Jessica's] job and tried to talk to them several times, tried to get them to dismiss the case, tried to get them not to show up. That's the issue in this case.

**{¶ 51}** Steven mischaracterizes the record when he asserts that defense counsel objected to the prosecutor's statement that Steven was recorded threatening to blow up his parents' home; defense counsel objected to the prosecutor stating that "they popped up at [Jessica's] job, meaning the mother - -", and not to the remark about Steven's threat to blow up his parents' home.

**{¶ 52}** As this Court has noted:

Failure to object waives all but plain error. *McBride v. Quebe,* Montgomery App. No. 21310, 2006-Ohio-5128. Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins*, Clark App. No. 2005-CA-10, 2006-Ohio-5399. "[T]o successfully prevail under plain error the substantial rights of the accused must be so adversely affected that the error undermines the 'fairness of the guilt determining process.' " *State v.*

*Ohl* (Nov. 27, 1991), Ashland App. No. CA-976, 1991 WL 274508.

*State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.).

**{¶ 53}** As the State notes, Steven's recorded statement was admitted into evidence. Plain error is not demonstrated. For the foregoing reasons, Steven's third assignment of error is overruled.

**{¶ 54}** The judgment of the trial court is affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
J. David Turner
Hon. Barbara P. Gorman