THE STATE OF OHIO, APPELLANT, *v.* CRESS, APPELLEE.

[Cite as *State v. Cress,* 112 Ohio St.3d 72, 2006-Ohio-6501.]

(Nos. 2005–1965 and 2005–2114—Submitted June 7, 2006—Decided December 27, 2006.)

———————————

MOYER, C.J.

{¶ 1} The Third District Court of Appeals has certified the following question in connection with the conviction of appellee, Shawn Cress, of a felony charge of witness intimidation of Tara Thacker: "Does a criminal charge of intimidation in violation of R.C. 2921.04(B) require the state to prove that the defendant has made a threat to engage in unlawful conduct?" The answer to this question is "no."

{¶ 2} The record establishes that Cress and Thacker became romantically involved in December 2002. Their relationship was unstable: Thacker conceded that they were often "on again, off again." She denied that Cress was ever

violent with her, although in the past she had requested at least one protective order from a probate court and provided a sworn written statement that Cress had stalked her and threatened to kidnap her children. After the events giving rise to this case, but prior to trial, they married. At trial, Thacker disavowed the allegations of stalking, but acknowledged that she had sought a protective order prior to the incident in question.

{¶ 3} The residences of Cress and Thacker were adjacent to each other, each apartment comprising one-half of a single building. During the early morning of April 26, 2003, Thacker telephoned police to report an intruder, Cress, in her home.

{¶ 4} The couple had argued in the hours before the incident. Cress wanted to speak with Thacker; she repeatedly refused and expressly denied him access to her home several hours before his intrusion. Unable to enter the apartment with Thacker's consent, Cress gained access by using the attic crawl space that connected their two apartments. Once inside the space, Cress moved an access panel in the ceiling of Thacker's bedroom closet so that he could descend into her home.

{¶ 5} Later, Thacker heard noises coming from one of the bedrooms. She went to investigate and discovered Cress in the closet. Thacker called police, and Cress returned to the other apartment. After interviewing Thacker and other witnesses at the scene, the police attempted to speak with Cress. When he did not respond to officers' repeated attempts to summon him to the door of his apartment, the police secured a search warrant, forced entry into the home, arrested Cress, and transported him to a local jail.

{¶ 6} Within hours of his arrest, Cress called Thacker from jail. During that conversation, Cress stated that if Thacker would refrain from getting Cress "in trouble," he, in turn, would not disseminate photographs of Thacker and others "smoking that bong in the basement." There can be no dispute that Cress intended to use the threat of disclosing the photographs to influence Thacker: he admitted to a police officer that he was using the photographs as a "scare tactic" against her.

{¶ 7} Cress was warned by authorities to cease making calls to Thacker while he was in custody. Cress, however, made seven other phone calls to various family members. In several of those calls, he requested his family's assistance in conveying messages to Thacker.

{¶ 8} In his first call to his mother, Cress stated, "[G]o talk to Tara. I don't know what's the matter with her. But you guys can probably talk to her. Because of those pictures, man. I don't wanna see her kids get taken away, but if I have to bring the nude pictures up in court for a defense, she's gonna lose her kids. * * * She needs to just move away and leave me alone. But Mom, if they

start charging me with this, I'm gonna have to show them all them pictures and everything else I got 'cause I got a bunch of other stuff on her, too, I been collecting in case something happens."

{¶ 9} In a subsequent series of conversations with his brother, Cress directed his brother to "[j]ust tell [the Cress parents] that Tara better drop these charges so I can get out [of jail] today" and repeatedly stated that Thacker "better hurry up and drop these charges 'cause I want out of [jail]." He then told his brother to also call Thacker and tell her that she had better drop the charges that day so that he could be released from custody.

{¶ 10} Later that day, Cress again spoke with his brother. Evidently dissatisfied that Thacker had not yet obtained his release from custody, Cress dictated to his brother a list of things that he would do if Thacker did not dismiss charges against him and instructed him to give her the list. Although the list was somewhat cryptic in parts, a jury could conclude that it indicated that Cress would (1) show child-protection authorities incriminating photographs of Thacker using illicit drugs and/or depicting her nude, (2) provide access to Thacker's basement to an appliance-rental company, apparently to recover a washing machine and dryer that were, by implication, in Thacker's possession improperly, (3) provide unspecified information to another rental company about Thacker's stereo and computer, (4) make her get rid of her pet dog and live-in babysitter because they were not permitted by the terms of the lease, (5) reveal to one of Thacker's family members that his girlfriend was having an affair, and (6) no longer permit her to use his motor vehicle.

{¶ 11} After relaying the list to his brother, Cress had another conversation with his mother. She told Cress that Thacker had contacted the jail and told them that she wanted the charges dropped, but that she had been informed that she could not do so because the police had filed the charges. In response, Cress repeatedly told his mother how Thacker was to secure his release:

{¶ 12} "Cress: I'm not staying in here any longer. I want a lawyer now.

{¶ 13} "Mrs. Cress: * * * [T]hey told her nothing could be done—

{¶ 14} "Cress: But it can, mom.

{¶ 15} "Mrs. Cress:—until Monday morning.

{¶ 16} "Cress: She gets a lawyer and goes up there and tells them she's lying. They call the lieutenant. The lieutenant will let me out. The lieutenant can let me out. That's who has to do it. * * *

{¶ 17} " * * *

{¶ 18} "Cress: I gotta get out of here right now.

{¶ 19} " * * *

{¶ 20} "Mrs. Cress: You're the one that screwed up and did this.

{¶ 21} "Cress: I did nothing. She lied, mom. She has to go, alright. One more time. Get a lawyer. Take her. Call [the jail]. Tell them to tell the lieutenant she was lying. To get me out of here right now or she's evicted. I'm sending those pictures to Children Services. I'm calling Rent–a–Center about her washer and dryer. I'm calling Rent–Way about her stereo. Calling Rent–A–Center about her computer. I am telling on her cousin for cheating on his, her husband. I'm getting her kids taken away. She's getting evicted. She losing her dog. She's out. That's the way it's gonna be. I want it done now.

{¶ 22} " * * *

{¶ 23} "You guys have done nothing yet. You've gotta do what I say. You haven't even done that yet.

{¶ 24} "Mrs. Cress: We can't get a lawyer on a Saturday.

{¶ 25} "Cress: You can get a lawyer on a Saturday. It just costs extra.

{¶ 26} "Mrs. Cress: And you better quit doing the threatening or she's not even gonna go to the Prosecutor tomorrow.

{¶ 27} Cress: She better [profanity]."

{¶ 28} Less than two hours later, Cress called his father. In that conversation, he reiterated that Thacker "is gonna tell them she's lying or that list I gave Michael [his brother] is gonna happen."

{¶ 29} Cress was indicted subsequently on several charges, including intimidation in violation of R.C. 2921.04(B). The case was tried before a jury, which heard Thacker testify that no one had attempted to get her to drop the charges by threatening her. The jury rendered verdicts of not guilty on all charges except that of intimidation of a witness in violation of R.C. 2921.04(B). Cress appealed, asserting various claims of error.

{¶ 30} The Third District Court of Appeals reversed Cress's conviction. The opinion of Judge Bryant concluded that "[e]very one of [Cress's] threats consists of conduct that Cress had a right to engage in. Without a showing of an express or implied threat of unlawful conduct, there can be no finding that Cress is guilty of intimidation." *State v. Cress*, 163 Ohio App.3d 46, 2005-Ohio-4620, 836 N.E.2d 35, at ¶ 6, citing *State v. Gooden*, 8th Dist. No. 81320, 2003-Ohio-2864, 2003 WL 21290932, at ¶ 27. Essentially, the opinion concluded that the term "unlawful threat of harm" in R.C. 2921.04(B) requires the state to prove that a specific threat must be, in and of itself, a threat to commit an unlawful act.

{¶ 31} The appellate court thereafter certified its decision as in conflict with decisions of the Second District Court of Appeals, *State v. Hoying*, Greene App. No. 2004–CA–71, 2005-Ohio-1366, 2005 WL 678989, and the Eighth District, *State v. Lutz*, Cuyahoga App. No. 80241, 2003-Ohio-275, 2003 WL 152837. On Decem-

ber 28, 2005, we accepted discretionary jurisdiction and also determined that a conflict existed. *State v. Cress,* 107 Ohio St.3d 1695, 2005-Ohio-6763, 840 N.E.2d 201.

{¶ 32} R.C. 2921.04 provides:

{¶ 33} "(A) No person shall knowingly attempt to intimidate or hinder the victim of a crime in the filing or prosecution of criminal charges or a witness involved in a criminal action or proceeding in the discharge of the duties of the witness.

{¶ 34} "(B) No person, knowingly *and by force or by unlawful threat of harm to any person or property,* shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness." (Emphasis added.)

{¶ 35} Significantly, a violation of R.C. 2921.04(B), involving force or an "unlawful threat of harm," constitutes a felony of the third degree, while violation of R.C. 2921.04(A) constitutes a misdemeanor of the first degree. R.C. 2921.04(D). Where, as in this case, the use of force to intimidate a witness is not alleged, the statute distinguishes between felony witness intimidation and misdemeanor witness intimidation by the presence of an unlawful threat of harm. We must therefore determine from the words of the statute the General Assembly's intent in adding the term "unlawful threat of harm" in R.C. 2921.04(B) to describe those instances of witness intimidation properly found to be felonious.

{¶ 36} In interpreting the phrase "unlawful threat of harm" in R.C. 2921.04(B), the opinion in the Third District Court of Appeals stated, "Without a showing of an express or implied threat of unlawful conduct, there can be no finding that Cress is guilty of intimidation." But the word "threat" is defined as "an expression of an intention to inflict evil, injury, or damage on another usu[ally] as retribution or punishment for something done or left undone." Webster's Third New International Dictionary (1986) 2382. It connotes almost any expression of intent to do an act of harm against another person irrespective of whether that act is criminal. *State v. Moyer* (1920), 87 W.Va. 137, 104 S.E. 407 ("The word 'threat' is very broad and indefinite. It includes almost any kind of an expression of intention of one person to do an act against another. Ordinarily, it signifies intention to do some sort of harm, but the realm of injury is equally broad and undefined. All wrongs are not criminal offenses").

{¶ 37} A witness threatened with perfectly legal conduct ("I will tell your spouse about our affair") may be more intimidated than a witness threatened with illegal conduct ("I will knock down your mailbox"). The most intimidating threat of all may be an indefinite one ("You'll be sorry"). We therefore reject the contention that the General Assembly intended to differentiate between felonious

witness intimidation and misdemeanor intimidation based on the legality of the threatened conduct, particularly when that construction is contrary to the rule of grammar that an adjective, here "unlawful," modifies the noun that follows it, here "threat." The General Assembly did not provide a definition of the term "unlawful threat," and we presume that it intended that the term be given its common meaning in accordance with the general rules of grammar.

{¶ 38} The adjective "unlawful" modifies the noun "threat" in R.C. 2921.04(B), and the statute includes no reference to unlawful conduct. "In construing a statute, it is the duty of the court to give effect to the words used in a statute, not to insert words not used. *Cleveland Elec. Illum. Co. v. Cleveland* (1988), 37 Ohio St.3d 50, 524 N.E.2d 441, paragraph three of the syllabus." *State v. S.R.* (1992), 63 Ohio St.3d 590, 595, 589 N.E.2d 1319.

{¶ 39} Both R.C. 2921.04(A) and (B) prohibit knowing attempts to intimidate a witness. We cannot hypothesize an instance in which the act of threatening a witness would not also constitute intimidation. The term "threat" represents a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct. See *Planned Parenthood League of Massachusetts, Inc. v. Blake* (1994), 417 Mass. 467, 474, 631 N.E.2d 985 (defining "threat" as "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"). To "intimidate" means to "make timid or fearful: inspire or affect with fear: frighten * * *; *esp.*: to compel to action or inaction (*as by threats*)." (Emphasis added and capitalization omitted.) Webster's Third New International Dictionary at 1184.

{¶ 40} "Intimidation" by definition involves the creation of fear in a victim, and the very nature of a threat is the creation of fear of negative consequences for the purpose of influencing behavior. We simply do not discern a meaningful difference between intimidation of a witness and the making of a threat to a witness. Accordingly, both R.C. 2921.04(A) and (B) prohibit the threatening of witnesses.

{¶ 41} An *unlawful* threat must accordingly connote more than just a threat, i.e., more than just a communication to a person that particular negative consequences will follow should the person not act as the communicator demands. The word "unlawful" in R.C. 2921.04(B) must add substantive meaning, or it is superfluous. Adoption of the state's argument requires us in effect to rewrite R.C. 2921.04(B) by deleting the adjective "unlawful" from the statute. The interpretation of the court of appeals requires us to rewrite the statute by construing the adjective "unlawful" as a modifier of the noun "conduct," a word not even used in the statute. We do not sanction either approach.

{¶ 42} We hold, rather, that the statutory language in R.C. 2921.04(B), proscribing intimidation by an "unlawful threat of harm," is satisfied only when

the very making of the threat is itself unlawful because it violates established criminal or civil law. For example, where the making of a threat constitutes the offense of coercion, in violation of R.C. 2905.12,[1] a misdemeanor, that offense would serve as a predicate offense for the crime of witness intimidation as proscribed by R.C. 2921.04(B), a felony.

{¶ 43} The court of appeals erred in holding that R.C. 2921.04(B) proscribes only threats of impending *criminal* conduct. The court of appeals nevertheless correctly reversed Cress's conviction of felonious witness intimidation in violation of R.C. 2901.14(B), as the state failed to prove that Cress made an unlawful threat of harm, i.e., it did not introduce evidence demonstrating the elements of any predicate offense.[2]

{¶ 44} The state obtained an indictment charging Cress with the felony offense of intimidation in violation of R.C. 2921.04(B) only. Although sufficient evidence may have been produced at trial to convict Cress of violating R.C. 2921.04(A), the state did not charge him with a violation of that section, nor did it ask the court to submit a charge of violation of R.C. 2921.04(A) to the jury for consideration as a lesser included offense.

{¶ 45} The state did not meet its burden of proving beyond a reasonable doubt that Cress made an "unlawful" threat, a required element for conviction of R.C. 2921.04(B), the only intimidation crime submitted to the jury. We therefore affirm the judgment of the court of appeals reversing the conviction of a violation of R.C. 2921.04(B) based on insufficiency of the evidence.

Judgment affirmed.

PFEIFER, O'DONNELL and LANZINGER, JJ., concur.

RESNICK, LUNDBERG STRATTON and O'CONNOR, JJ., dissent.

---

1. {¶ a} R.C. 2905.12(A) establishes the offense of coercion, a misdemeanor of the second degree. It provides:

{¶ b} "No person, with purpose to coerce another into taking or refraining from action concerning which the other person has a legal freedom of choice, shall do any of the following:

{¶ c} "(1) Threaten to commit any offense;

{¶ d} "(2) Utter or threaten any calumny against any person;

{¶ e} "(3) Expose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, to damage any person's personal or business repute, or to impair any person's credit;

{¶ f} "(4) Institute or threaten criminal proceedings against any person;

{¶ g} "(5) Take, withhold, or threaten to take or withhold official action, or cause or threaten to cause official action to be taken or withheld."

2. Cress was charged with the crime of extortion, in violation of R.C. 2905.11(A)(5), but the jury returned a verdict of not guilty on that charge.

O'CONNOR, J., dissenting.

{¶ 46} Although the majority properly finds error in the analysis of the Third District's lead opinion, I dissent from its conclusion that the term "unlawful threat" requires the state to show that the defendant threatened to commit an act that was illegal per se.

{¶ 47} As the Sixth Circuit observed in interpreting a federal threats statute, "To determine what type of action [the legislature] intended to prohibit, it is necessary to consider the nature of a threat. At their core, threats are tools that are employed when one wishes to have some effect, or achieve some goal, through intimidation. This is true regardless of whether the goal is highly reprehensible or seemingly innocuous." *United States v. Alkhabaz* (C.A.6, 1997), 104 F.3d 1492, 1495. The majority acknowledges that not all threats are necessarily criminal or illegal and that the term "threat" encompasses a broad array of conduct. The General Assembly similarly was well aware of that fact when drafting R.C. 2921.04(B).

{¶ 48} The context in which words are spoken is as important as the words themselves. See, e.g., *State v. McCornell*, Cuyahoga App. No. 81581, 2003-Ohio-2474, 2003 WL 21101258, ¶ 8 ("Although the statement is ambiguous standing alone, its meaning must be assessed in light of the surrounding circumstances"); *State v. Lawson* (Dec. 7, 1994), Summit App. No. 16886, 1994 WL 687211, *2 ("Words are not scientific symbols. Their meanings are often dependent upon the context and manner in which they are used"). This is particularly true in cases involving threats. See, e.g., *State v. Brunswick* (1941), 69 Ohio App. 407, 424, 24 O.O. 161, 44 N.E.2d 116, quoting 18 Ohio Jurisprudence (1928) 916 (a threat " 'may be done by innuendo or suggestion. Any language which conveys a threat with adequate clearness is sufficient. In some instances to ascertain whether language conveys a threat, it must be taken with the circumstances under which it is spoken, and the relations between the parties must be considered' "); *In re Burke* (1899), 9 Ohio C.D. 350, 357, 1899 WL 1257 ("no precise words are needed to convey a threat. * * * [I]f it can be found [from the circumstances] that the purport and natural effect of the language amounts to a threat, then the mere form of words is unimportant).

{¶ 49} I believe that the legislature, accordingly, wished to make the intimidation and retaliation statutes as expansive as possible to afford protection from threats to as many victims and witnesses as possible. Indeed, in 1995 the General Assembly acted deliberately to expand the proscriptions against intimidating or retaliating against victims and witnesses. See Am.Sub.H.B. No. 88, 146 Ohio Laws, Part I, 528–530, amending R.C. 2921.04(B) to prohibit intimidation of attorneys as well as victims and witnesses and enacting R.C. 2921.05 to prohibit retaliation. See, also, *State v. Lambert* (June 5, 1998), Montgomery App. No.

16667, 1998 WL 288957, *4; *State v. Fuqua*, Hardin App. No. 6–02–01, 2002-Ohio-4697, 2002 WL 31007358 (R.C. 2921.05 was designed "to protect the sanctity of the judicial process and those that participate within it").

{¶ 50} In so doing, however, the legislature wisely recognized that the statute could not be of unlimited breadth due to the constitutional protections afforded to speech. See, e.g., *Watts v. United States* (1969), 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (noting that statutes proscribing threats "must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech"). See, also, *United States v. Bowker* (C.A.6, 2004), 372 F.3d 365, 380 (in affirming convictions for telephone harassment against an overbreadth challenge, noting that speech intended to invade a victim's privacy and communicate express or implied threats of harm is not constitutionally protected). The term "unlawful" denotes conduct that is "[c]riminally punishable," "[n]ot authorized by law; illegal," or that "[i]nvolv[es] moral turpitude," Black's Law Dictionary (8th Ed.2004) 1574, i.e., "[c]onduct that is contrary to justice, honesty, or morality." Id. at 1030 (defining moral turpitude). I believe its use here, as a modifier to the term "threat," evinces a clear legislative intent to distinguish between speech that is constitutionally protected and speech that is not protected because it is used for an unlawful means, e.g., to influence, intimidate, or hinder a crime victim. This case clearly exemplifies the legislature's wisdom in doing so.

{¶ 51} Cress had a constitutional right to disclose the information he threatened to disclose, assuming that it was true. He could report Thacker to the proper authorities for any conduct that was criminal or that endangered her children; he could distribute, within the boundaries permitted by law, incriminating photographs of her; he could disclose the presence of a dog and a residential babysitter with the intent to get her evicted for violating the terms of her lease; and he could reveal the details of an extramarital affair. Simply disclosing that information as part of a bitter breakup might have been, in the words of the appellate court, "distasteful," but would not have been illegal. Cress, however, did not simply exercise his right to speak. Rather, a rational jury could (and did) find that he used his lawful right to disclose the information for an unlawful purpose, i.e., to force Thacker to recant statements she had made to the police in an attempt to hinder his prosecution. I believe that is exactly the speech that the General Assembly meant to reach in enacting the statute at issue here, and I agree with the well-reasoned opinions of those courts that have so found. See, e.g., *State v. Hoying*, Greene App. No. 2004–CA–71, 2005-Ohio-1366, 2005 WL 678989, and *State v. Lutz*, Cuyahoga App. No. 80241, 2003-Ohio-275, 2003 WL 152837, ¶ 53 (properly finding that an "unlawful threat" may be one that is directed to the subject's finances, reputation, or employment if it is made in an attempt to influence the subject's participation in a criminal proceeding); *State v.*

*Thomas,* Lucas App. No. L–02–1375, 2004-Ohio-6458, 2004 WL 2785292 (rejecting claim that the appellant's conviction for violating R.C. 2921.04(B) was against the manifest weight of the evidence when the "unlawful threat" he uttered to the victim during a prosecution for domestic violence was the statement "I will see you later"); *State v. Robertson* (Feb. 6, 1992), Cuyahoga App. No. 59686, 1992 WL 19816 (affirming conviction of intimidation for a mother who told her 12–year–old daughter that she would love her more if she recanted rape charges against the mother's boyfriend). I would therefore reverse the judgment of the court of appeals.

RESNICK and LUNDBERG STRATTON, JJ., concur in the foregoing opinion.

---

Jim Slagle, Marion County Prosecuting Attorney, and Renée Potts, Assistant Prosecuting Attorney, for appellant.

Collins & Lowther, L.P.A., and Kevin P. Collins, for appellee.