[Cite as *State v. Horn*, 2024-Ohio-369.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                        Court of Appeals No.  OT-22-059

    Appellee                                        Trial Court No.  20 CR 253

v.

Jeannett Horn                                        **<u>DECISION AND JUDGMENT</u>**

    Appellant                                       Decided:  February 2, 2024

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Thomas A. Matuszak, Assistant Prosecuting Attorney, for appellee.

W. Alex Smith, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} The defendant-appellant, Jeannett Horn, appeals the March 14, 2023 judgment of the Ottawa County Court of Common Pleas convicting her of six counts of retaliation and sentencing her to community control.  For the following reasons, we affirm.

## I. Background

**{¶ 2}** This primary piece of evidence in this case is a one-minute message left by Horn on the voicemail of Ottawa County Sheriff's Detective, Aaron Leist, on December 2, 2020. In the voicemail, Horn identified six public officials in the Ottawa County area and asked the detective to "[t]ell them [that] I want my money, or they can kiss their kids goodbye" and that "and if I don't get all my mother-fucking money in the next 24-hours, they're [going to] be dead, in the next four weeks." Horn also accused the named officials of "stalking me in Alabama" and "listening to me in Alabama."

**{¶ 3}** The public officials named by Horn had been involved, in some capacity, in a 2002 criminal case against her, captioned *State v. Horn,* Ottawa County Court of Common Pleas case No. 02-CR-088 (hereinafter "the drug case"). In that case, Horn was convicted of drug possession and sentenced to a mandatory prison term of ten years. In the voicemail underlying this case, Horn identified, by name, the trial judge who presided over her case (whom Horn mistakenly believed had died) and six others: the former county prosecutor, the assistant prosecutor, the lead detective, two members of the Ottawa County Drug Task Force, and her court-appointed lawyer, "H.W."

**{¶ 4}** Horn was indicted on December 10, 2020 of committing six counts of retaliation, in violation of R.C. 2921.05(A) and (C), one count for each person she threatened, all felonies of the third degree. A warrant was issued for Horn, who was

2.

believed to be in Alabama. Horn was served with the warrant on January 4, 2021 and extradited to Ottawa County. [1]

{¶ 5} Horn's trial was delayed while the trial court evaluated her competency. The trial court ultimately determined that Horn was competent to stand trial, and her trial went forward on September 7, 2022. At trial, the state admitted certified documents from Horn's 2003 trial to establish each victim's role in the drug case. In total, three witnesses testified: Horn's former attorney, H.W.; Detective Leist; and Horn.

{¶ 6} H.W. testified that he met with Horn approximately ten to twelve times over the course of his representation of her in the drug case. H.W. had no contact with Horn after the case was resolved. In early December 2020, the prosecutor's office contacted H.W. and asked him to listen to Horn's voicemail. Afterward, H.W. felt "really concerned" because he had "never had a threat like that before," and he was "particularly" concerned for his family, including his seven children and 17 grandchildren. H.W. and his wife began "looking over [their] shoulders [and] watching for strange cars following [them]." Even after law enforcement "increase[d] surveillance" at his home, H.W. also "wound up" buying firearms for him and his wife and installing a home security system. Later in the trial—after Horn provided a voice exemplar—H.W. was recalled to the witness stand. He testified that he "clearly" recognized Horn's voice as the voice "that was on the threatening message."

---

[1] Horn was initially served with the Ohio warrants in early December but was mistakenly released by authorities in Alabama. She was re-served on January 4, 2021.

3.

{¶ 7} Detective Leist testified next. Although Detective Leist was off duty on December 2, 2020, he was checking his messages remotely. As he explained, when a voicemail is left on his "desk phone," located in the Ottawa County courthouse, the message is sent via a "media file" to his email. Detective Leist checked his email that day, noticed a voicemail from a number he did not recognize, and listened to it. Detective Leist testified that the one-minute message played for the jury was the same one he heard that day.

{¶ 8} Detective Leist testified that "[a]ny threat is always concerning," but he was particularly concerned by Horn's message because she sounded "volatile." Detective Leist thought it was "imperative" to get "the ball rolling" by finding out Horn's location and the location of the individuals she named in her voicemail. The detective did not know Horn or anything about her 18-year-old criminal case, and although he recognized some names, he did not "actively" work with any of them. Detective Leist therefore requested assistance from the prosecutor's office. He also submitted an emergency request to Bandwidth, Inc., which confirmed that the call was placed from a line associated with Jeannette Horn, and that the call was placed from Birmingham, Alabama. Next, Detective Leist presented the evidence to a judge, who found probable cause to issue warrants for her arrest.

{¶ 9} Detective Leist also called Horn, but she did not answer. He left a message and asked for a call-back. Horn returned Leist's call the next day, on December 3, 2020,

4.

and the recorded call, lasting 27 minutes, was played for the jury. During the call, the detective told Horn that there were six warrants for her arrest and that, because of the charges, she did not need to talk to him. Horn confirmed that she had been served with the warrants and proceeded to explain what caused her to leave the voicemail. Detective Leist stayed "pretty much silent" and "just listen[ed] to her."

{¶ 10} Horn complained to the detective that she had been "done wrong" back in 2003, blaming her conviction on "pay-offs" and perjured testimony. She also made cryptic allegations that the same officers involved in the drug case were "still * * * harassing" her, in Alabama, and she expressed her intention to sue each person who had been "in the courtroom" back then. Horn told Detective Leist that, before she left a message on his voicemail, she had made some "friendly" phone calls to Ottawa County to let officials know that they would be "polygraphed." In response, Horn had been "cussed out, * * * hung up on [and] bull[ied]." So, by the time Horn was routed to the detective's voicemail, she admitted to having some feelings of "animosity." When told by Detective Leist that there were six retaliation charges against her, one "for each person [she] threatened to kill," Horn responded by asking, "I said I was going to kill them?"

{¶ 11} At the conclusion of the state's case, the defense moved for an acquittal, which the court denied.

5.

{¶ 12} Horn provided a voice exemplar, and also testified in her own defense. Horn admitted to leaving the one-minute voicemail, and the bulk of her testimony was explaining what caused her to place that call.

{¶ 13} According to Horn, her voicemail to Detective Leist was the fourth call she placed that day. All four calls related to a recent, alleged arrest in Alabama, "on * * * drug charges from Ottawa County." Horn produced no evidence to substantiate her claim, but she insisted that she had been recently arrested in Alabama for drug offenses that were alleged to have been committed in Port Clinton, Ohio. Horn claimed to have told authorities in Alabama that she "hadn't been in Port Clinton, [Ohio] to get any drug charges placed on [her] and that the drug warrant they had was a fictitious drug warrant." Horn claimed that she was released from custody when "Ottawa County didn't respond" to the arresting authorities in Alabama.

{¶ 14} At trial, Horn appeared to blame the six officials from the drug case for conspiring to have her served with the alleged "drug warrant." Following her release, Horn began calling officials in Ottawa County "to find out why [she] got arrested on drug charges." And, because she intended to bring a civil suit against the six named officials, she also wanted to request "paperwork," such as "subpoenas" and "transcripts" from her 2003 trial. During Horn's third phone call, she got into a "verbal altercation" with an un-named officer with the Ottawa County Sheriff's Department, who "lied" and spoke to her in a "derogatory" manner and ultimately hung up on Horn. When Horn attempted to call

6.

the officer back, her call was routed to Detective Leist's line, where she left the "embarrassing" one-minute voicemail.

{¶ 15} Following Horn's testimony, defense counsel stipulated that no drug charges were filed against Horn in Ottawa County over the preceding three years.

{¶ 16} The jury found Horn guilty as charged, and the trial court convicted her of six counts of retaliation. Following a presentence investigation, the trial court placed Horn on community control for a period of five years, subject to a number of conditions, including that she engage in mental health and substance abuse treatment. Horn appealed the trial court's March 14, 2023 Revised Sentencing Judgment Entry. She presents two assignments of error for our review.

> I. The evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that Appellant was guilty of retaliation.

> II. Appellant's conviction was against the manifest weight of the evidence presented by the State and was contrary to law.

## II. Law and Analysis

### 1. Sufficiency of the evidence.

{¶ 17} In her first assignment of error, Horn argues that her retaliation convictions are not supported by sufficient evidence.

{¶ 18} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a

7.

challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 19} The retaliation statute, R.C. 2921.05, provides, in relevant part, that

(A) No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness. * * *

Thus, under R.C. 2921.05(A), the state was required to establish that Horn "(1) purposefully, (2) by unlawful threat of harm to any person, (3) retaliated against a public servant or attorney, (4) because that person discharged his [or her] duties in a criminal

8.

proceeding." *State v. Myers*, 6th Dist. Wood No. WD-15-017, 2016-Ohio-223, ¶ 10, quoting *State v. Nayar,* 4th Dist. Lawrence No. 07CA6, 2007-Ohio-6092, ¶ 14.

{¶ 20} It is firmly established that "[t]he retaliation statute does not require that any threat of harm be communicated directly to the person threatened by the person doing the threatening." *Id.,* citing *State v. Farthing,* 146 Ohio App.3d 720, 724, 767 N.E.2d 1242 (2d Dist.2001). Rather, a violation will be found where "the defendant was either aware that the threats would be communicated to the intended victim by the third person or could reasonably have expected the threats to be so conveyed." (Quotation omitted.) *Farthing* at ¶ 16; *See, e.g., State v. Dalton,* 2d Dist. Montgomery No. 28262, 2019-Ohio-4364, ¶ 26 (Where the defendant told clinician, who was evaluating him for an alternative program to jail, that he "will kill" the victim for testifying against him, the fact-finder did not lose its way in determining that defendant "reasonably could have expected that the[clinician] * * * would convey that threat either directly to [victim] or to persons who would share the information with [victim].").

{¶ 21} On appeal, Horn argues that the state presented insufficient evidence that she engaged in "purposeful" conduct. A person acts purposely when "it is the person's specific intention to cause a certain result, *or,* when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." (Emphasis added.) R.C. 2901.22 (A).

9.

{¶ 22} Horn claims that she did not act purposefully because she was merely "venting" when she made those "wild claims" and that she did not intend to "kill anyone." But, while Horn denies any specific intent to cause harm, purposeful conduct may also be shown with evidence that she specifically intended to engage in the prohibited conduct. Here, Horn concedes that she intentionally left the threatening voicemail, explaining that she felt "frustrated" and "upset" at the time. At trial, she expressed her "embarrassment" and "remorse," and stated, "I take responsibility for the voicemail." In short, Horn admits to making the call and that the words were hers. Therefore, because there is evidence that Horn specifically intended to engage in the conduct at issue—i.e., leaving a threatening voicemail—there is sufficient evidence that her conduct was purposeful.

{¶ 23} Horn also argues that her voicemail did not contain an "unlawful threat of harm," as required by the statute. Although Horn concedes that, "on its face," her voicemail "appears" to constitute a threat of harm, she claims that "a deeper look" at the voicemail "and subsequent phone call" with Detective Leist reveals that her words were not "actual threats." Horn's arguments, however, speak to the weight of the evidence rather than sufficiency. A reasonable factfinder could certainly conclude that Horn's words—"[t]ell them [that] I want my money, or they can kiss their kids goodbye" and "if I don't get all my mother-fucking money in the next 24-hours, they're [going to] be dead,

10.

in the next four weeks"—amounted to a "threat of harm."  The harder issue here is whether there was sufficient evidence that Horn's threat of harm was "unlawful."

{¶ 24} As the Supreme Court recognized in *State v. Cress,* 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341, ¶ 41—a case involving the crime of intimidation under R.C. 2921.04(B), which also proscribes the making of an "unlawful threat of harm"— "[a]n *unlawful* threat must accordingly connote more than just a threat, i.e., more than just a communication to a person that particular negative consequences will follow should the person not act as the communicator demands."  (Emphasis in original.)  *Id.* at ¶ 41.  For that reason, the court held "that the statutory language in R.C. 2921.04(B), proscribing intimidation by an 'unlawful threat of harm,' is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law."  *Id.* at ¶ 42.  That is, the state must show that the threat itself, not the threatened conduct, is unlawful.  *Id.*

{¶ 25} The holding of *Cress* has been applied to retaliation cases.  *See, e.g., State v. Ott,* 11th Dist. Portage No. 2007-P-093, 2008-Ohio-4049, ¶ 25; *State v. Smith*, 9th Dist. Summit No. 25069, 2010-Ohio-3983, ¶ 28.

{¶ 26} In *Ott,* the defendant was charged with retaliation after making repeated, indefinite threats to law enforcement, such as, "you've screwed with the wrong guy."  In concluding that the state presented legally sufficient evidence of an unlawful threat of harm, the appellate court reasoned that, "[m]inimal research quickly reveals that a trier of

11.

fact could conclude that Ott's threats were unlawful, since the state presented evidence that Ott's threats violated Ohio's disorderly conduct and telecommunications harassment statutes." *Id.* In addition, the appellate court interpreted *Cress* to mean that, while "the threat itself must violate a predicate offense," the "failure to designate a predicate offense [in the indictment or otherwise] is not fatal" to the state's case. *Id.* at ¶ 26; *accord Smith* at ¶ 28-29 ("[Appellant] has failed to demonstrate that the absence of a predicate offense in an indictment for retaliation is plain error, that is to say, an obvious deviation from a legal rule.").

{¶ 27} Here, as in *Ott* and *Smith,* the state did not identify a predicate offense in the indictment or at trial, but we note that the trial court correctly instructed the jury that "an 'unlawful threat of harm' has occurred only when the very making of the threat is itself unlawful because it violates criminal or civil law." And, because Horn communicated her threats via telephone, her threats were "unlawful" because they violated R.C. 2917.21(B)(1), Ohio's telecommunications harassment statute, which provides that "[n]o person shall make or cause to be made a telecommunication, * * * with purpose to abuse, threaten, or harass another person."[2]

---

[2] In addition, because H.W. testified that Horn's voicemail caused him to feel "concern" for the safety of his entire family, so much so that he purchased firearms and a home security system, a trier of fact could also find that Horn committed the predicate offense of disorderly conduct in connection with the count of retaliation related to H.W., specifically. *See* R.C. 2917.11(A)(1) ("[n]o person shall recklessly cause inconvenience, annoyance, or alarm to another by * * * [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior[.]").

12.

{¶ 28} In sum, the state presented sufficient evidence that Horn acted purposefully when she left the threatening voicemail, and there was sufficient evidence of an "unlawful threat of harm" under R.C. 2921.05(A). Horn's first assignment of error is found not well-taken.

## 2. The weight of the evidence

{¶ 29} In her second assignment of error, Horn argues that her retaliation convictions are against the manifest weight of the evidence.

{¶ 30} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388, 678 N.E.2d 541. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 31} Horn contends that the "context" of her voicemail—which she does not further describe—and her "disconnected" thinking "call into question" the seriousness of

13.

her threats.  For example, she insists that her words, "they can kiss their kids goodbye" was slang for "going to jail," which she claimed would be the consequence for the six public officials' role in the alleged "fictitious drug warrant."  Horn denied that she threatened to inflict physical harm to the victims or their children.

{¶ 32} But, despite Horn's explanations at trial, Horn explicitly stated in her voicemail that if she did not receive her money in the next 24-hours, then the victims would be "dead in the next four weeks."  We simply cannot conclude that the jury lost its way in finding that these words constituted a serious threat.

{¶ 33} Horn also points to her extended conversation with Detective Leist, the day after leaving the voicemail, as evidence that her voicemail did not constitute a "true threat" because she "made it clear that she had no intention of carrying out any acts."  In contrast, the state argues that Horn's recorded call with Detective Leist demonstrates that she "doubl[ed] down" on her death threats because she said "I'm going all in;" and "I'm not backing down;" and "I'm taking care of my business;" and "I'm not scared."

{¶ 34} We listened to the entirety of Horn's call with Detective Leist, and in our view, Horn's comments relate solely to her newly-articulated intention *to sue* the six victims.  That is, Horn told Detective Leist that she was "calling to say" that she intended to "have them all subpoenaed to be polygraphed" and that she would take the case to the "Supreme Court," because, as she asserted in rapid succession, "I'm going all in like I'm not backing down" and "I'm not scared of nothing."  Horn quickly added that she was

"not trying to intimidate" but was merely "taking care of [her] business" because—when she had called before and "talk[ed] all sweet"—she was "cussed out and hung up on." Horn closed out her monologue with Detective Leist, indicating that she would be agreeable to combining her civil suit with the state's criminal case against her if it "gets [her] in the courtroom faster than in Alabama." Accordingly, Horn did not actually "double down" on her death threats during her conversation with Detective Leist, as argued by the state in its brief.

{¶ 35} Regardless, it was still up to the jury to determine whether or not Horn intended to abuse, threaten, or harass the various officials that she named on her voicemail, and it clearly rejected Horn's benign explanation for her behavior. Although we consider credibility when reviewing for manifest weight, we extend special deference to the jury's credibility determinations, given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. For that reason, we simply cannot say that the jury's conclusion—that Horn's voicemail message contained an unlawful threat of harm—was against the manifest weight of the evidence. *Accord State v. Baughman,* 5th Dist. Richland No. 01CA70, 2002-Ohio-4845, ¶ 26-40 (Where prisoner sent letters to spouse of his trial counsel and trial judge who convicted him, in which he expressed violent fantasies and admitted that the letters "could have

been perceived as threatening," his conviction for retaliation was not against the manifest weight of the evidence).

{¶ 36} Finally, Horn argues that it was "not reasonable for [her] to believe that her [voicemail] would be conveyed" to the victims. Again, absent evidence of a direct threat, the defendant must have known that the threat would be communicated, or could reasonably expect that it would be conveyed, to the victims. *Farthing,* 146 Ohio App.3d at 724, 767 N.E.2d 1242 (2d Dist.2001). Here, Horn *specifically asked* Detective Leist to "tell" the victims that she wanted her money in the next 24 hours or harm would follow. It would be unreasonable to expect that a law enforcement officer would not pass along a serious threat to the intended victims. Indeed, Leist testified that he considered Horn's threats particularly "concerning" because of how "volatile" she sounded.

{¶ 37} For these reasons, we find that Horn's conviction was not against the manifest weight of the evidence. Horn's second assignment of error is not well-taken.

### III. Conclusion

{¶ 38} Drawing all inferences in favor of the state, the state presented sufficient evidence that Horn committed six counts of retaliation, in violation of R.C. 2921.05. Moreover, the jury did not lose its way when it rejected Horn's testimony that she did not intend to cause any harm. We, therefore, find Horn's first and second assignments of error not well-taken. We further affirm the March 14, 2023 judgment of the Ottawa

County Court of Common Pleas. Horn is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.           _____
JUDGE

Myron C. Duhart, J.

_____

Charles E. Sulek, P.J.        JUDGE
CONCUR.

_____
JUDGE

---

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.