[Cite as *State v. Golga*, 2024-Ohio-1410.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No. 23CA011946 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| MATTHEW A. GOLGA | | ELYRIA MUNICIPAL COURT COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 2021-CRB-00305 |

## DECISION AND JOURNAL ENTRY

Dated: April 15, 2024

HENSAL, Judge.

**{¶1}** Matthew Golga appeals his conviction for telecommunications harassment by the Elyria Municipal Court. For the following reasons, this Court reverses.

### I.

**{¶2}** The City of North Ridgeville ("the City") shut off the water supply to Mr. Golga's residence because of nonpayment. He responded by calling the City's Water Department eight times over the course of 26 minutes. During the calls, he screamed, used profanity, and insisted his service be restored. An accounting clerk attempted to aid him but ended several calls because Mr. Golga would not stop screaming and cursing at her. Needing a moment, she allowed another of his calls to go to voicemail. He left the following voicemail message:

> [Y]ou can't just be hanging up on people. That's f***ing bullsh*t. If you're f***ing trying to kill me by turning my f***ing water off, then f*** you. And if you'd like me to come down to the f***ing thing, we can have a f***ing conversation, go f*** yourself! You think you're f***ing bad? Yeah, f*** him. Let's starve him out. Let's f***ing kill 'em all, right? F*** you!

Mr. Golga eventually spoke with the City's public utilities director who came up with a plan to restore Mr. Golga's water service the next morning.

After Mr. Golga's voicemail message was forwarded to the police, he was charged with one count of telecommunications harassment in violation of Revised Code Section 2917.21(A)(1). A jury found him guilty of the offense. The municipal court sentenced Mr. Golga to 180 days in jail but suspended 177 of them. It also ordered him to complete anger management. Mr. Golga has appealed, assigning three errors. Because the second assignment of error is dispositive, we will address it first.

II.

ASSIGNMENT OF ERROR II

THE STATE'S EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION FOR TELECOMMUNICATIONS HARASSMENT BECAUSE IT WAS UNDISPUTED THAT GOLGA HAD A LEGITIMATE PURPOSE FOR HIS CALLS (RESTORING WATER SERVICE TO HIS HOME) AND THERE WAS NO EVIDENCE THAT HE SPECIFICALLY INTENDED TO HARM ANYONE BY MAKING THE CALLS.

{¶3}  In his second assignment of error, Mr. Golga challenges the sufficiency of the evidence the State presented in support of his conviction. Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

**{¶4}** Section 2917.21(A)(1) prohibits any person from knowingly making a telecommunication "with purpose to harass, intimidate, or abuse any person at the premises to which the telecommunication is made, whether or not actual communication takes place between the caller and a recipient * * *." "'Abuse' may be defined as '[t]o injure (a person) physically or mentally.'" (Alterations in original.) *State v. Shuck*, 9th Dist. Wayne No. 19AP0040, 2020-Ohio-6989, ¶ 15, quoting *Black's Law Dictionary* (11th Ed.2019). Intimidation "involves the creation of fear in a victim," especially by way of threats. *State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, ¶ 40. "Finally, 'harassment' may be defined as '[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation.'" (Alterations in original.) *Shuck* at ¶ 15, quoting *Black's Law Dictionary* (11th Ed.2019).

**{¶5}** The telecommunications-harassment statute "focuses on the caller rather than on the content of the speech; it is the intent with which the call is made that establishes the criminality of the conduct." *Akron v. Hawthorne*, 9th Dist. Summit No. 13670, 1989 WL 10333, *1 (Feb. 8, 1989). "Thus, the critical inquiry of telecommunications harassment is not whether the recipient was in fact abused, [intimidated], or harassed by the telecommunication, but rather whether the purpose of the caller was to abuse, [intimidate,] or harass the recipient." *Shuck* at ¶ 13. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "In the absence of direct evidence, a defendant's intent to abuse, [intimidate], or harass may be established by the surrounding facts and circumstances." *Shuck* at ¶ 14.

{¶6}     It is understandable that the employees felt harassed, intimidated, and abused by Mr. Golga's profanity-laced tirades and they were justified in hanging up on his repeated calls. For Mr. Golga to be guilty of telecommunications harassment, however, we must focus on his state of mind and whether it was his purpose to "abuse, [intimidate], or harass" them. *Id*. at ¶ 13.

{¶7}     A careful review of the record reveals that it does not contain any evidence that Mr. Golga's calls were made to purposefully abuse, intimidate, or harass the employees.  The employees testified that Mr. Golga called the utilities department to get his water service turned back on.  He began the first call politely but became irate when he learned that they could not or would not help him.  He began repeatedly swearing at them and accused them of trying to kill him and his children by depriving them of water.  He specifically told a child who was with him that the employee he was talking to wanted to kill the child.  The employees could not remember exactly what Mr. Golga said during the phone calls, but said it was similar in content to his voicemail.  Mr. Golga stopped calling after the public utilities director intervened and made arrangements with Mr. Golga to have his service restored.

{¶8}     In his voicemail, Mr. Golga expressed that he thought the employees were trying to harm and harass him.  He rejected their invitation to come down to the utilities department to have a conversation.  He accused them of trying to act "bad[,]" trying to "f*** him" over, trying to starve him, and trying to kill him.  Those are statements of one who is threatened, not one who is intentionally seeking to harass, intimidate, or abuse others.  The dissent contends that there was no evidence that the employees invited Mr. Golga to come to the water department, but the employee who initially received Mr. Golga's calls testified that, after a customer receives a final shut off notice, the customer must come into the department to make arrangements to continue their service, which includes putting the arrangements in writing.

{¶9} Because there was no evidence of purposeful intent by Mr. Golga, we conclude that his conviction for telecommunications harassment is not supported by sufficient evidence. We, therefore, conclude that it must be reversed. Mr. Golga's second assignment of error is sustained. Because resolution of this assignment of error makes his other assignments of error moot, we decline to address them. App.R. 12(A)(1)(c).

III.

{¶10} Mr. Golga's second assignment of error is sustained. The judgment of the Elyria Municipal Court is reversed.

Judgment reversed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Elyria Municipal Court, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
CONCURRING.

**{¶11}** I concur in the majority's analysis and resolution of the second assignment of error as I believe the State failed to present sufficient evidence to sustain Golga's conviction for telecommunications harassment.

**{¶12}** I write separately to express my concern that prosecutions for telecommunications harassment such as the one here could have a chilling effect on the First Amendment rights of citizens to contact government offices in order to redress grievances. Courts should remain mindful that the First Amendment affords protections against laws which abridge the freedom of speech as well as the freedom to petition the government to redress grievances.

FLAGG LANZINGER, J.
DISSENTING.

**{¶13}** I respectfully dissent. I would conclude that the State presented sufficient evidence to sustain Mr. Golga's conviction for telecommunications harassment. As such, I would overrule his second assignment of error. I also would overrule his remaining assignments of error on their merits.

**{¶14}** The accounting clerk in the City's Water Department answered several calls from Mr. Golga the day the City shut off his water supply. She testified that Mr. Golga quickly became angry and refused to listen to any information she had about why his water had been shut off. She had to hang up on him several times because he would not stop screaming and swearing at her. Even when she tried to offer ways to help, the accounting clerk testified, Mr. Golga would not give her the chance to finish her statements. He would talk over her and continue to scream. After

hanging up on him a few times, the accounting clerk allowed one of his calls to go to voicemail. Mr. Golga then left the voicemail message quoted at the outset of this opinion.

{¶15} The City's Public Utilities Director testified that she was the accounting clerk's immediate supervisor. She sat directly alongside the accounting clerk and was present each time Mr. Golga called. Even though the accounting clerk had the phone receiver pressed to her ear, the Public Utilities Director testified that she could hear Mr. Golga screaming at the accounting clerk through the phone. After the accounting clerk let one of his calls go to voicemail, the Public Utilities Director began answering his calls. She testified "there was no talking to him" because, "the more [she] tried to deescalate, the more escalated he became." Mr. Golga "didn't want to hear about resources, he just wanted [his] water back on." At one point, he told her that he was in his car with his kindergartner. Mr. Golga screamed at his child, "this nice utility lady on the phone wants to kill you. She shut our water off." The Public Utilities Director testified that Mr. Golga continued screaming and cursing until she too began terminating his calls.

{¶16} Mr. Golga's behavior caused the Public Utilities Director to leave the office and go to her supervisor, the Safety Services Director, for help. While she was gone, the accounting clerk listened to Mr. Golga's voicemail message. The Public Utilities Director and the Safety Services Director then returned and also listened to the message. The Public Utilities Director testified that the "very scary" nature of the message caused her to forward it to the Chief of Police.

{¶17} The next time Mr. Golga called, he spoke with the Safety Services Director. The Safety Services Director ultimately agreed that the City would restore Mr. Golga's water service if Mr. Golga immediately came down to the Water Department to make a partial payment and paid his remaining balance within two days. The accounting clerk and the Public Utilities Director were present when Mr. Golga arrived at the office. They both testified that Mr. Golga introduced

himself by calling himself a name. Neither could recall the exact term he used, but both women thought he referred to himself as "the psychopath."

{¶18} Both the accounting clerk and the Public Utilities Director repeatedly expressed how Mr. Golga's calls negatively affected them. They testified that they felt abused, intimated, harassed, and concerned for their safety. The accounting clerk testified that, in her 17 years working for the Water Department, she "only had two customers that [she had] been truly * * * worried about them coming to City Hall and Mr. Golga was one of them." The Public Utilities Director testified that, of all the "irate residents" she had dealt with during her time at City Hall, Mr. Golga "rank[ed] at number one."

{¶19} Chief of Police Michael Freeman testified that he listened to Mr. Golga's voicemail and took a statement from the Public Utilities Director. He testified that Mr. Golga called the Water Department eight times between 3:14 p.m. and 3:40 p.m. He cited Mr. Golga with telecommunications harassment because Mr. Golga kept calling for the apparent purpose of intimidating or harassing the Water Department's employees. The Chief noted that, in the voicemail Mr. Golga left, Mr. Golga was not seeking to resolve the situation with his water bill. He was simply screaming, cursing, and threatening to come down to City Hall. The Chief testified that "there was no legitimacy to the phone call at all" and it was "pure aggression, intimidation, abuse."

{¶20} The majority concludes that there was no evidence of any purposeful intent on the part of Mr. Golga to harass, intimidate, or abuse others. Regarding his voicemail, the majority writes:

> In his voicemail, Mr. Golga expressed that he thought the [City] employees were trying to harm and harass him. He rejected their invitation to come down to the utilities department to have a conversation. He accused them of trying to act "bad[,]" trying to "f*** him" over, trying to starve him, and trying to kill him.

The majority construes Mr. Golga's statements as statements of one who is being threatened, not one who is intentionally harassing, intimidating, or abusing another.

{¶21} The record does not support the majority's reading of Mr. Golga's voicemail.

{¶22} There is no evidence that either the accounting clerk or the Public Utilities Director ever invited Mr. Golga to come to the Water Department to resolve this manner. Indeed, both women testified that they were *afraid* he would come to the Water Department. The accounting clerk said Mr. Golga's voicemail statement about coming down to the Water Department intimidated her because she felt his statement was "like him saying he's going to come down and do something to force us to get his water back on * * *." Both women testified that they only provided Mr. Golga with contact information for two organizations that routinely helped to people pay for their utilities. Thus, the record reflects it was Mr. Golga who, unprompted, suggested the females might "like [him] to come down to the f***ing thing * * *." To the extent his statement could be construed as an innocuous one, a sufficiency review demands evidence be construed in a light most favorable to the State. In conducting that review, this Court must not weigh the evidence or usurp the jury's function as the finder of fact.

{¶23} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved its case beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. Mr. Golga repeatedly called the Water Department to scream and curse at the two females who answered his calls. Even if he initially called the department for a legitimate purpose (i.e., to have his water service restored), the accounting clerk testified that he quickly became aggressive when he was told his water service would not be restored without payment. The change in the tone and manner of his speech, combined with the frequency of his calls, evidenced a specific intent to abuse, intimidate, or harass the accounting

clerk and the Public Utilities Director. Both women described how Mr. Golga screamed at them, swore at them, and refused to listen to any of their efforts to aid him. The voicemail he left did not contain any pleas for aid or questions about the restoration of his service. He left the voicemail to condemn the accounting clerk for terminating his call, accuse her of trying to kill him, and suggest she might like him to "come down to the f***ing thing" to "have a "f***ing conversation." Both the accounting clerk and the Public Utilities Director noted that Mr. Golga's calls were some of the worst they had received while working for the City. Indeed, Mr. Golga appeared to recognize the outrageousness of his own behavior when he introduced himself in person as "the psychopath" or something similar. Based on the foregoing evidence, the jury reasonably could have concluded that it was Mr. Golga's specific intent to mentally injure the females, cause them fear, and/or annoy, alarm, or cause them substantial emotional distress for no legitimate purpose. *See Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, at ¶ 40 (defining "intimidation"); *Shuck*, 2020-Ohio-6989, at ¶ 15 (defining "abuse" and "harassment"). Accordingly, I would reject Mr. Golga's sufficiency argument and overrule his assignments of error.

APPEARANCES:

PETER PATTAKOS and GREGORY GIPSON, Attorneyat Law, for Appellant.

SEAN F. KELLEHER, Prosecuting Attorney, for Appellee.